UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEREMY JORDAN-JONES,<br><br>Defendant. | **SEALED INDICTMENT**<br><br>25 Cr.<br><br>25 CRIM 232 |

**COUNT ONE**
**(Wire Fraud)**

The Grand Jury charges:

**Overview**

1. From at least in or about January 2021 through at least in or about November 2022, JEREMY JORDAN-JONES, the defendant, engaged in a scheme to defraud investors in Amalgam Ventures ("Amalgam"), a technology startup that purported to offer point-of-sale systems and blockchain-based payment and security solutions. JORDAN-JONES misrepresented that Amalgam had developed functioning software products, falsely claimed that it had lucrative high-profile partnerships with major-league sports teams and prominent payment-processing platforms, and made misleading statements about Amalgam's financial condition. JORDAN-JONES also falsely represented to investors that their money would be used for listing a proprietary cryptocurrency coin on global cryptocurrency exchanges, as well as for hardware, software, and other expenses associated with the Amalgam's operations.

2. In truth, as JEREMY JORDAN-JONES, the defendant, well knew, Amalgam had no operable products, few—if any—customers, and zero legitimate business partnerships. Based on his materially false and fraudulent representations, JORDAN-JONES obtained over $1 million from investors and lenders, much of which he used for his personal benefit. Ultimately, Amalgam

ceased operations, and investors and lenders suffered significant financial losses.

### The Defendant Solicited Investments in Amalgam Based on Representations About the Success of the Company

3. JEREMY JORDAN-JONES, the defendant, marketed Amalgam to investors and lenders as a blockchain-based software company that had developed or was in the process of developing proprietary cryptocurrencies, a secure file-storage system built on Amalgam's blockchain technology, and a digital payment system that leveraged Amalgam's blockchain technology.

4. JEREMY JORDAN-JONES, the defendant, personally solicited investments by representing that Amalgam was an established, revenue-generating enterprise backed by major corporate partnerships. For instance, in investment materials that JORDAN-JONES caused to be transmitted to an investor, he represented that Amalgam had contracts in place with its first clients "to begin [monthly recurring revenue] of $3.25MM and minimum annual revenues of $39MM." JORDAN-JONES also claimed that Amalgam had clients ready to scale up to over a billion dollars in monthly transaction processing. In another instance, JORDAN-JONES wrote that Amalgam was "in the midst of onboarding a crypto fund ready to execute several hundred million in transactions," and, in still another message, JORDAN-JONES asserted that Amalgam would be handling a deal with a financial software company "for a minimum of $100mm in processing per month."

5. JEREMY JORDAN-JONES, the defendant, also solicited investments by representing that Amalgam had partnerships that would drive future revenue growth for Amalgam, including with a reputable payment-processing platform for businesses, several cryptocurrency funds, sports teams, and a global digital bank. For example, in an investment deck, which

JORDAN-JONES caused to be sent to an investor, Amalgam claimed to have partnered with a major restaurant industry group and fast-tracked Amalgam's payment processing system for a pilot program with 500 restaurants. For further example, JORDAN-JONES represented that Amalgam had partnered with a professional soccer club in England's Premier League to process $4 billion in payment processing transactions, which was projected to generate approximately $295 million in revenue over the next 12 months. For yet another example, in a due diligence report, JORDAN-JONES caused Amalgam to represent that there was an exclusive joint venture with the Golden State Warriors that would result in millions in revenue.

6. JEREMY JORDAN-JONES, the defendant, further solicited investments by telling investors that their funds would be used to develop and launch Amalgam's products and operate the business. For example, JORDAN-JONES told one investor that the investor's $150,000 would be used to facilitate listing Amalgam's cryptocurrency token on a reputable cryptocurrency exchange. Similarly, JORDAN-JONES told a venture capital fund that its investment would be used for the development and launching of Amalgam's payment processing system. At no time did JORDAN-JONES tell any investor that their funds would be used for his own personal expenses.

7. As JEREMY JORDAN-JONES, the defendant, knew, the company's product development, partnerships, ability to generate revenue, and intended use of investor funds were all subjects material to prospective investors' decisions to invest in Amalgam.

**The Defendant Defrauded Investors Through a Series of Misrepresentations**

8. While JEREMY JORDAN-JONES, the defendant, claimed that Amalgam was a cutting-edge technology and payment processing company, building a platform based on the blockchain, in reality, as JORDAN-JONES well knew, Amalgam had no working product, virtually no real customers, no signed partnerships with major corporations, and no meaningful revenue. Amalgam was not processing billions of monthly transactions and did not have millions of dollars in monthly recurring or annual revenue. JORDAN-JONES's claims that that Amalgam had valuable partnerships were similarly false and misleading because Amalgam had no contracts with, for instance, a major restaurant industry group, an English Premier League soccer team, or the Golden State Warriors.

9. Instead, JEREMY JORDAN-JONES, the defendant, operated Amalgam as a vehicle for personal enrichment, using investor funds to purchase luxury vehicles, fund extravagant vacations, and finance a lavish lifestyle wholly disconnected from Amalgam's purported business operations. While JORDAN-JONES told one investor that the invested funds would be used to facilitate the listing of a cryptocurrency token on an exchange, within days of receiving the money JORDAN-JONES spent it on hotels and restaurants in Miami. When JORDAN-JONES received $500,000 from another investor to use toward expenses associated with Amalgam's payment processing platform, JORDAN-JONES used the money on, among other things, car payments, rent, and luxury apparel, and withdrew at least $90,000 in cash.

**Statutory Allegations**

10. From at least in or about January 2021 through in or about November 2022, in the Southern District of New York and elsewhere, JEREMY JORDAN-JONES, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for

obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JORDAN-JONES engaged in a scheme to obtain money from investors by means of false and misleading statements about Amalgam's financial condition, partnerships, technology, and use of investors' funds, and in furtherance of that scheme used interstate wires, some of which transited to, from, or through the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

11.   The allegations contained in paragraphs 1 through 9 of this Indictment are repeated and realleged as if fully set forth herein.

12.   From at least in or about January 2021 through in or about November 2022, in the Southern District of New York and elsewhere, JEREMY JORDAN-JONES, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit

upon a person, to wit, JORDAN-JONES, and others working at his direction, made false and misleading statements to investors about Amalgam's financial condition, partnerships, technology, and use of investors' funds.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (False Statements to a Financial Institution)

The Grand Jury further charges:

13.     In or about July 2022, JEREMY JORDAN-JONES, the defendant, applied for a corporate credit card issued by a financial institution insured by the Federal Depository Insurance Corporation. In order to induce the bank to issue him the corporate credit card, JORDAN-JONES submitted a falsified Amalgam bank statement, covering the period from June 1, 2022 to June 30, 2022, which purported to show that the account had a cash balance of over $18 million. In truth, there were no funds in the bank account as it had been closed in late 2021. As a result of JORDAN-JONES's false representations, he was able to obtain a corporate credit card.

14.     In or about August 2022, when the financial institution froze Amalgam's corporate card account and inquired about the source of funding for Amalgam, JORDAN-JONES attempted to unfreeze his account by sending a falsified term sheet for a convertible promissory note reflecting an $8 million loan from an investor to Amalgam and bearing that investor's signature and professional title. In reality, the verified convertible promissory note and accompanying term sheet signed by that investor was worth only $500,000. By on or about November 14, 2022, JORDAN-JONES had an outstanding balance on that card of over $350,000.

**Statutory Allegations**

15.     From at least in or about July 2022 through in or about August 2022, in the Southern District of New York and elsewhere, JEREMY JORDAN-JONES, the defendant, knowingly made a false statement and report, and willfully overvalued land, property, and security, for the purpose of influencing the actions of a financial institution, the accounts of which were insured by the Federal Depository Insurance Corporation, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, and insurance agreement and application for insurance and a guarantee, and charge and extension of any of the same, by renewal, deferment of action and otherwise, and the acceptance, release and substitution of security therefor, to wit, JORDAN-JONES made false statements regarding, among other things, the amount of money in Amalgam's bank account in order to induce the issuance of a corporate credit card by a financial institution insured by the Federal Depository Insurance Corporation and to maintain use of that card.

(Title 18, United States Code, Sections 1014 and 2.)

**COUNT FOUR**
**(Aggravated Identity Theft)**

The Grand Jury further charges:

16.     The allegations contained in paragraphs 13 through 14 of this Indictment are repeated and realleged as if fully set forth herein.

17.     In or about August 2022, in the Southern District of New York and elsewhere, JEREMY JORDAN-JONES, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, JORDAN-JONES

transferred a falsified term sheet for a convertible promissory note reflecting an $8 million loan from an investor to Amalgam and bearing that investor's signature and professional title during and in relation to the false statement violation charged in Count Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1),
1028A(b), and 2.)

## FORFEITURE ALLEGATIONS

18. As a result of committing one or more of the offenses charged in Counts One and Two of this Indictment, JEREMY JORDAN-JONES, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

19. As a result of committing the offense alleged in Count Three of this Indictment, JEREMY JORDAN-JONES, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

20. If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

> (Title 18, United States Code, Section 981(a)(1)(C);
> Title 18, United States Code, Section 982(a)(2)(A);
> Title 21, United States Code, Section 853(p);
> Title 28, United States Code, Section 2461.)

_____        _____
GRAND JURY FOREPERSON        JAY CLAYTON
                                                 United States Attorney